KANSAS CITY v. KANSAS CITY TERMINAL RAILWAY COMPANY, Appellant.—23 S. W. (2d) 1006.

Division One, February 3, 1930.

*Samuel W. Sawyer, John H. Lathrop* and *Richard S. Righter* for appellant.

464

*John T. Barker* and *J. C. Petherbridge* for respondent.

ELLISON, C.—This is an action at law for damages brought by Kansas City, Missouri, against the Kansas City Terminal Railway Company, to recover the amount of certain street grading tax bills issued against an $8\frac{1}{2}$-acre tract known as Union Station Park. The city, in a prior action prosecuted by the owner of the tax bills, had been compelled to pay them, and in this suit asserts the obligation rested on the Terminal Company to discharge the bills under the implied covenants in its franchise, and that it consequently must reimburse the city. The cause was tried to the court, sitting as

a jury, and the city had judgment for the full amount claimed, $23,702. The defendant Terminal Company has appealed.

The case turns mainly on the construction to be placed on the appellant's franchise. In July, 1909, by ordinance the respondent city granted and in November, 1909, the appellant Terminal Company accepted, a franchise authorizing it to build a union passenger station in Kansas City and in connection therewith to construct and maintain certain tracks, bridges, viaducts, subways and other structures for a period of 200 years. All this entailed the vacation of certain streets and alleys in the city. As part consideration for the franchise the Terminal Company agreed therein to purchase and transfer or cause to be purchased and transferred to Kansas City within four years the 8½-acre tract above mentioned, which adjoined on the south the site of the proposed union station.

By so agreeing, says the city, the Terminal Company impliedly covenanted that the title to be conveyed should be good and free from liens up to the date of the delivery of the deed. The grading tax bills were issued October 21, 1913. The deed was delivered four days later on October 25, 1913. By express reservation in the deed the special assessment for grading was excepted from its covenants of warranty, and a separate written contract was contemporaneously executed providing the rights and liabilities of both parties with respect thereto should stand as they were under the law and not be prejudiced by the delivery of the deed. This left the matter to be governed by the provisions of the franchise ordinance. The pertinent parts thereto are as follows:

"Sec. 17. (a) In further consideration of the passage of this ordinance, the Kansas City Terminal Railway Company agrees that, within four (4) years from the date when the vacations are made, it will purchase and transfer, or cause to be purchased and transferred to Kansas City, the following described land immediately south of the proposed Union Passenger Station in Kansas City, Missouri, provided for in Section 11 hereof: [Here follows detailed description.]

"(b) The said property shall be transferred and conveyed to Kansas City upon the express conditions, to which Kansas City hereby gives consent, that it shall be graded by Kansas City within twelve years after the date when the vacations are made as provided in Section 2 hereof, in such manner as shall be approved by the Board of Park Commissioners of Kansas City, and that no street-car line or lines shall be located, constructed or operated on said property, or any part thereof, nor shall any public carriage, omnibus or automobile stand be permitted thereon without the consent of the Kansas City Terminal Railway Company; nor shall any buildings or other structures be located thereon, except such as are suit-

able for the use and ornamentation of said property for park purposes. If Kansas City shall fail to grade said property as above provided the said property shall revert to the Kansas City Terminal Railway Company; and if any of said property shall have been acquired by Kansas City by condemnation as provided in the following paragraph (c) of this section, said property so acquired shall be conveyed to the Kansas City Terminal Railway Company.

"(c) If the Kansas City Terminal Railway Company shall be unable within the said period of four (4) years to purchase, or cause to be purchased, all of said property upon terms satisfactory to it, then Kansas City, at the expiration of said four-year period, or prior thereto, upon receipt of written notice from the Kansas City Terminal Railway Company, requesting it so to do, agrees, so far as it has power so to do, to proceed to condemn said property or so much thereof as the Kansas City Terminal Railway Company may be unable to purchase upon satisfactory terms, in the manner provided by law; and, in that event, the Kansas City Terminal Railway Company agrees that it will pay to Kansas City the cost of instituting such condemnation proceedings and the amount of damages that may be awarded therein; but a decision of the court holding that Kansas City has no power to condemn said land shall not relieve the Kansas City Terminal Railway Company from its agreement to purchase said land, or any part thereof, but in such event, there shall be a reasonable extension of time in which said purchase and conveyance may be made; provided, that all said property that may be so acquired or condemned by the city shall be accepted and received by Kansas City upon the same conditions heretofore in this section set forth. The title to any property condemned by Kansas City in accordance with this paragraph shall be taken and held by Kansas City subject to the express conditions contained in paragraph (b) of this section.

"(d) All lands acquired by Kansas City in accordance with this section shall be forever maintained, improved and adorned without any expense whatever, directly or indirectly, to the Kansas City Terminal Railway Company except as provided in Section 37 hereof; provided, however, that if the Kansas City Terminal Railway Company shall at any time cease to maintain and operate a Union Passenger station upon or adjacent to the site mentioned in Section 11 of this ordinance, then said property shall be and become the absolute property of Kansas City, without any restrictions or conditions whatever. . . .

"Sec. 37. The Kansas City Terminal Railway Company hereby agrees that all its right of way and other property now or hereafter owned may be charged with all taxes and local or special assessments for public improvements that might be lawfully assessed or made

a charge against its property if it were not used for railroad purposes, and that it will promptly pay and discharge the same.''

The events leading up to the issuance of the grading tax bills were as follows. About a year before the granting of the franchise in 1909, the city had passed an ordinance, in June, 1908, providing for the grading of a part of Main Street. The park site abutted the part of Main Street to be graded. This grading project was separate and independent from the union station development, so far as the record shows. A contract for the street grading work was awarded in July, 1910, somewhere near a year after the franchise ordinance had been passed, and the work was prosecuted to a conclusion and completed in August, 1913. The tax bills therefor were issued October 21, 1913, as heretofore stated. The assignee of that part of the tax bills covering the park site brought suit thereon against the city, the Terminal Company and others, and by agreement and compromise recovered a personal judgment against the city in November, 1919, the cause being dismissed as to the Terminal Company. In consenting to this disposition of the case the Terminal Company expressly stipulated that it did not waive any rights of action or defenses under the contract preserving the *status quo ante* executed when the deed was delivered on October 25, 1913, as recited in a preceding paragraph of this opinion. The city paid and satisfied the judgment in October, 1920, about a month before the institution of this suit.

Going back a little. At or about the time the franchise was granted by the city to the Terminal Company in 1909, the latter had a mortgage outstanding against all or a part of its real estate, which was expressed to cover after-acquired property. When it set about buying up the land for Union Station Park as required by the franchise, it provided the purchase money, but took the deeds in the name of a subsidiary corporation, the Jasper Land & Improvement Company, to avoid the effect of this after-acquired-property mortgage clause, which might have clouded the title if taken in its own name. The Terminal Company owned all the stock of the Jasper Land & Improvement Company, and the officers or nominees of the former were the officers of the latter. The first purchase was consummated in April, 1910, and all the land had been acquired by March 27, 1911.

According to the evidence offered by the appellant, about a month or so later, in May, 1911, the Terminal Company prepared a resolution containing a proposed form of ordinance and deed conveying the park site from the Jasper Land & Improvement Company to the city, and presented it to the city's Board of Park Commissioners for adoption. The resolution recommended to the Common Council that the ordinance be passed and the deed accepted in the form sug-

gested. The Park Board did not adopt the resolution for two reasons, according to the testimony for appellant. One was that a controversy had arisen even at that early date as to whether the city or the Terminal Company would be liable for the special assessment for the grading of Main Street, which was then going on, and the other reason was that the city at that time did not have the money necessary to grade the park site, itself, which it was bound to do within twelve years under Section 17 (b) of the franchise ordinance. This testimony, we say, was offered by the appellant Terminal Company, but on objection by the city it was excluded.

Meanwhile, apparently, the work of grading Main Street was nearing completion. On June 22, 1913, the Terminal Company tendered a deed of the park site to the Park Board, but it was not accepted. On September 24, 1913, a second deed was tendered and the tender refused by the president of the Park Board. On September 30, 1913, a third deed was tendered to two of the members of the Park Board, the third member being out of the city. This tender was rejected, and was then made to the mayor, the Hon. Henry L. Jost, who, likewise, declined to accept it. On October 3, 1913, a fourth deed was offered to Mayor Jost, this time, also, ineffectually.

It appears from the record that this scrambling effort of the Terminal Company to get the title passed to the city, and the refusal of the city to accept the several deeds, were due in part, at least, to the fact that the parties feared their respective or alternative liabilities for the grading tax bills might be affected by whether title was transferred before or after the tax bills were issued. That thought seems to have been in mind, though other questions entered into the situation.

The city successfully objected to the admission in evidence of these four deeds, and contends here they were severally insufficient to constitute a valid tender, because they did not comply with the franchise ordinance for the following reasons. All four deeds were signed by the Jasper Land & Improvement Company alone, as grantor, the Terminal Company not joining therein, whereas the franchise provided if the city failed to grade the station park within twelve years the title to the park site should *revert* to the Terminal Company, and if the Terminal Company failed to maintain its union station at the location designated for the whole term of the franchise the title of Kansas City to the park should become absolute. The city maintains the Terminal Company was a necessary party to the deed to make these covenants binding on it; and that such is the general rule of law, aside from these special provisions, notwithstanding the franchise contract called for no covenants of warranty in the deed and merely required the Terminal Company to "purchase and transfer, *or cause to be purchased and transferred*" to Kansas City the park site.

Other objections urged below and here are that all of the four deeds provided if Kansas City should fail to grade the park within twelve years the title should revert to the grantor, the Jasper Land & Improvement Company, instead of the Terminal Company as the franchise ordinance provided; that none of the deeds except the last one, dated October 3, 1913, contained a provision reciting the title of Kansas City to the park site should become absolute if the Terminal Company abandoned or moved its union station during the term of the franchise; and that the deeds of June 22nd and September 24, 1913, were tendered to the Park Board, or members thereof, and not to the mayor.

Other facts will be noted, as necessary, in the course of the opinion.

I. The city's brief concedes the crucial question in the case "hinges upon the construction and meaning of the words 'will purchase and transfer, or cause to be purchased and  transferred'" appearing in Section 17 of the franchise ordinance. As applying thereto the rule of law is invoked that "in a sale of land, without condition, there is an implied covenant on the part of the vendor to make a good marketable title to the land." [Quoting from Green v. Ditsch, 143 Mo. 1, 12, 44 S. W. 799, 802; see also, 57 A. L. R. p. 1269, note, where many cases are cited.]

Under the above doctrine, which is undisputed, the city contends that inasmuch as the Main Street grading ordinance had been passed in 1908, a year before the franchise was granted, the parties must be deemed to have contracted with reference thereto as an encumbrance or prospective encumbrance, and the Terminal Company was bound to discharge and pay off the special assessment whenever it ripened into a lien, there being nothing in the subsequent transactions between the parties whereby the city waived that requirement. It is further urged that since none of the four deeds tendered prior to the last one complied with the terms of the franchise, and since the last deed was delivered after the tax bills had been issued and created a lien against the title standing in the name of the Jasper Land & Improvement Company, therefore the Terminal Company was liable regardless of whether the grading proceedings constituted an encumbrance within the meaning of the franchise before the tax bills were issued or not.

We are unable to adopt this view of the case. It is evident the Terminal Company did not warrant the title against the special assessment for grading unless it did so in the franchise contract. The deed which was made and accepted expressly reserved that question. And we are of the opinion that the provisions of the franchise ordinance were not such as to make it the legal duty of

the Terminal Company to convey a title free of the lien of the grading tax bills, even granting they created a lien against the title held by the Jasper Land & Improvement Company.

It is said in 39 Cyc. page 1497:

"A special assessment which is a lien on the land contracted for is an encumbrance or tax within the meaning of a contract to convey free and clear from all encumbrances, or encumbrances and taxes; but it is otherwise if the assessment complained of is clearly void. *It has been held that to render the vendor liable or excuse the purchaser from performance the assessment must have become a lien upon the land at the date of the contract*; . . . (Italics ours.)

The case cited in support of the italicized portion of the text is Everett v. Marston, 186 Mo. 587, 85 S. W. 540. There, a contract for the sale of real estate in Kansas City, dated in July, 1901, provided the vendor should deliver "a good and sufficient deed . . . properly executed, free and clear of all liens and incumbrances of every kind, excepting only such as are to be assumed by the buyer hereunder . . ." In an earlier paragraph it was stipulated that "the seller agrees . . . to pay all special taxes and assessments which are now liens on said property . . . ; state and county taxes for 1901, and all subsequent taxes are to be assumed and paid by the buyer." At the end of the contract there was added the further provision: "Seller agrees to pay all paving taxes in full."

At the date of the execution of the contract paving and sidewalk improvements had been constructed and completed on Oak Street abutting the lots sold, but the special assessment tax bills therefor were not issued until afterward. The paving tax bills, however, were issued before any deed had been tendered under the contract. The suit was for specific performance, and the main question in dispute was whether the tax bills should be discharged by the vendor, or paid by the purchaser.

After reviewing many authorities this court squarely and pointedly ruled the pendency of the special assessment proceedings at the time of the execution of the contract, and the fact that the two street improvements were complete and in place when the contract was made, did not create a lien or encumbrance against the property; that the liens dated from the issuance of the tax bills by force of the provisions of the Kansas City charter; and that since the tax bills had not been issued and the liens were not in existence when the contract was made, and the contract provided the seller would pay all special taxes and assessments "which *are now liens*," it meant he would not pay special assessments that had not ripened into liens. And so it was held the vendor was not bound to discharge the tax bills.

This Everett case, as we say, appears to be bottomed on the fact that the contract there considered expressly bound the vendor to pay

special assessments which were *then* liens; and on the principle of the maxim *expressio unius est exclusio alterius,* this was deemed to negative the idea that he should pay special assessments subsequently ripening into liens, though before the delivery or tender of a deed. But there is some language in the opinion which seems to announce a *general* rule that a covenant in a land contract to convey a marketable title free from incumbrance speaks from the date of the contract, and, as regards special assessments, has no reference to liens later coming into existence. On that interpretation of the case, doubtless, it is cited in the footnote to the text from 39 Cyc. 1497, earlier quoted in this opinion. The particular paragraph we have in mind is as follows (186 Mo. l. c. 603, 85 S. W. l. c. 544):

"Our conclusion then is that the covenant in the contract to make a deed free from liens and *encumbrances* did not obligate the defendant to pay these tax bills which were neither liens nor encumbrances when the contract was made, and the liability relates to the date of the contract which fixed the rights of the parties."

But later Missouri cases do go the whole way in declaring the general doctrine just stated. In Blivis v. Franklin Inv. Co., 197 Mo. App. 369, 375, 194 S. W. 1078, 1079, the vendee in a contract for the sale of real estate in St. Louis, dated August, 1905, sued the vendor for repayment of the amount of a special tax bill against the property he had purchased, and for specific performance. By the contract the vendor sold the land to the vendee for $491, on which a down payment of $37.50 was made, the balance to be due in seventy-five equal monthly payments. It was provided when all the purchase money had been paid the vendee should be entitled to a warranty deed "free and clear from all incumbrances, except as to taxes for the year 1905 and thereafter, which the (vendee) assumes and agrees to pay." Four years later the city of St. Louis paved an abutting street by special assessment and a tax bill was issued against the property in 1910. The vendee was forced to pay thereon the amount for which he sued. The contract then had about two years to run. On the familiar doctrine that as between a vendor and purchaser of land under an executory contract equity regards the purchaser as the beneficial owner, subject to liability for the unpaid purchase price, and the vendor as holding the legal title in trust for him (27 R. C. L. 465, sec. 178) the St. Louis Court of Appeals said, citing the Everett case, supra:

"We hold that the covenant against incumbrances which was to be included in the deed to be executed when all the purchase price had been paid, was intended to cover incumbrances, if any, existing at the date of the bond and those which might thereafter be imposed upon the lot by the act of the vendor and which tended to depreciate the value of the lot as that value was at the date of the

bond, and did not cover special assessments subsequently imposed against the property for street improvements which presumably went to the enhancement of the value of the property.''

Gotthelf v. Stranahan, 138 N. Y. 345, 34 N. E. 286, 20 L. R. A. 455, is a leading case on the question. There, a contract for the sale of land in Brooklyn was made in January, 1891, and the time for performance twice extended for the accommodation of the vendor. During the period of these extensions two special benefit assessments were laid against the property by the city of Brooklyn. Under the charter of that city such assessments could be made before the construction of the improvement—as was done in this instance—and the city might elect to abandon the project and refund the assessments. The suit was in equity to compel the vendor to convey a title free and clear of the special assessment liens. The evidence failed to show whether the initial proceedings for the assessments were instituted before the contract was executed, and as we have said, the improvement work had not been done.

The court said it was impossible to suppose the parties intended by their contract to bind the vendor for special assessment liens created by law *in invitum* under proceedings initiated after the agreement had been made. Such liens could not have been in contemplation, and to require the seller to discharge them would make him convey a property of greater value for less money. In other words, he would have to satisfy the assessment out of the consideration received, whereas the property by conclusive presumption would be increased in value a corresponding amount. On the other hand, said the court, a different question would be presented if the assessment were for an improvement already made when the contract was entered into, for then it could be assumed the parties fixed the consideration with reference to the augmented value of the property. But the court did not mention or consider, unless inferentially, a third alternative, namely, instances where, as in this case, the initial proceedings for the assessment antedate the contract, but the work had not yet been done when it was made. We think, however, this question came within the range of the judgment rendered because the opinion observed it could not be known when the contract was made whether the streets involved would be improved, and even if the parties so anticipated they must have realized the charge therefor would represent an increased value of the property in the hands of the vendee. The case holds that while the benefit assessments were in a strict sense liens and encumbrances under the Brooklyn charter, yet they were not encumbrances within the meaning of the contract, and the following general rule is announced:

''The contract to convey free from incumbrances ordinarily has reference to incumbrances or liens actually existing when the con-

tract is executed, or thereafter created, or suffered by the act or default of the vendor.''

But if the Gotthelf case, just discussed, is not on the point as to what the rule would be, when the initial proceedings for a public improvement antedate the contract and the work is done afterward, there is another case that is. In Cornelius v. Kromminga, 179 Iowa, 712, 161 N. W. 625, the contract was for an exchange of farms each vendor agreeing to convey free and clear of incumbrances. While negotiations for the trade were pending it was known to both parties that a drainage improvement was in contemplation in the district where one of the farms was located, and that some of the preliminary steps had been taken. About four months after the execution of the contract, but nearly three months before the time for performance (the deeds being in escrow), a special assessment for the drainage work was levied. It was held the vendee, not the vendor, must pay it.

We shall not further extend the opinion by discussing the other cases cited in appellant's brief, though the following seem to be generally in accord with the foregoing authorities: Johnson v. Dalrymple, 140 Mo. App. 232, 243, 123 S. W. 1020, 1023; Carey v. Gundlefinger, 12 Ind. App. 645, 40 N. E. 1112; Kimberlin v. Templeton, 55 Ind. App. 155, 102 N. E. 160; Robison v. Cato, 79 Ind. App. 530, 137 N. E. 569; Dothan Natl. Bank v. Hollis, 212 Ala. 628, 103 So. 589; Armstrong v. Banking Trust Co., 96 Kan. 722, 153 Pac. 507, Ann. Cas. 1918D, 972; Etta Contracting Co. v. Bruning, 134 La. 48, 63 So. 619.

The respondent attempts in its brief to distinguish the cases referred to above by the difference in their facts, but, while the facts do differ with the case, we think they all are in harmony with appellant's contention, and that the conclusions drawn by respondent are incorrect. For instance, it is argued the Everett case and the Blivis case, first discussed, were rightly decided and the grantee was properly required to pay the tax bills in dispute, because the sales contracts involved obligated the purchaser to pay the ''taxes'' for the period covering the date when the tax bills were issued and became liens. But these decisions cannot be put aside on any such ground. For a long time it has been the law that the word ''taxes'' in its ordinary acceptation does not cover special assessments (Sheehan v. Good Samaritan Hospital, 50 Mo. 155); and the Blivis case (197 Mo. App. l. c. 373, 194 S. W. l. c. 1079) expressly held liability could not be imposed on the vendee for that reason.

Looking at the facts, themselves, in this case, while the grading ordinance was passed about a year before the franchise was granted, yet the city did not let a contract for the work until more than a year afterward; and there is nothing in the record indicating the

project could not have been abandoned at any time, at least before the grading contract was made. But even if this be incorrect it seems far-fetched to say the city and Terminal Company dealt with each other at that early stage of the grading proceedings as if the street improvement were completed, and on that basis fixed the consideration at an enhanced figure which the city paid in advance; and it is only on that theory that we can infer the Terminal Company agreed to pay the special assessment.

So far as that goes, there is no direct evidence that the Terminal Company had actual notice of the passage of the grading ordinance, but as the Gotthelf case says, if the parties did have the street improvement in mind they must have recognized it would inure to the benefit of the city, and if the situation be measured by the reasoning applicable to the ordinary land sale between two individuals, there was no reason why they should not appraise the property at its *then* value, leaving the payment of the special assessment, more or less uncertain in amount, to the beneficial owner who would get the enjoyment from the improvement. It may be and is suggested this is not an ordinary case; that the property was to be conveyed in part consideration for a franchise, and that the city might very naturally require the conveyance of the property in, or on the basis of, its improved condition. But if it was an extraordinary case why was the franchise contract silent altogether on the subject of encumbrances? We see nothing to take the case out of the rule declared in the Everett and Blivis decisions heretofore reviewed.

II. The city urges the further proposition that the conclusion reached in the preceding paragraphs is not applicable to the facts of this case because it rests on the equitable doctrine making the vendee in an executory contract for the sale of land the beneficial owner and the vendor his trustee, whereas in this case the city had no equitable title since the legal title stood in the name of the Jasper Land & Improvement Company, and the equitable title in the Terminal Company, which furnished the purchase money. It is asserted the city had no contractual relation with the Jasper Land & Improvement Company whereby it could enforce its right.

This contention is wholly erroneous. It is not claimed the Jasper Land & Improvement Company was a purchaser for value without notice, and the record abundantly shows the contrary. There is no doubt but that the city could have joined the Jasper Company and the Terminal Company as codefendants in an action for specific performance and have obtained relief, the other facts permitting. [36 Cyc. 574; McDonald v. Yungbluth, 46 Fed. 836.] The holding in this McDonald case, as compressed in the first syllabus is:

"It is no objection to a specific enforcement of a contract to convey land that the legal title is held by one not a party to the contract, where such person is a party to the suit, and it appears that he holds the title in trust for the vendors."

Neither is it true that because this is a law action and not a suit in equity, the equitable doctrine mentioned cannot be invoked by the defendant. [Snyder v. Murdock, 51 Mo. 175; Manning v. North British etc. Ins. Co., 123 Mo. App. 456, 99 S. W. 1095; Sewell v. Underhill, 197 N. Y. 168, 90 N. E. 430, 27 L. R. A. (N. S.) 233.]

III. The respondent city makes several points by way of argument without citation of authority, two of which we shall notice. The first is that paragraph 17 (b) of the franchise ordinance provided if the city should fail to grade the park within twelve years the property should revert to the Terminal Company. It is contended by the city that under this clause the Terminal Company had a reversionary interest in the fee and therefore can be said to have had an actual beneficial interest such as made the grading tax bills an incumbrance chargeable to it. We think it is unnecessary to discuss this suggestion, inasmuch as it is founded on the assumption that the city may break its own contract. Furthermore, the city showed by its witness Donnelly that it had graded the park several years before the trial at a cost of nearly $150,000. So it seems from this evidence there is and was no possibility of a reverter.

Another point made is that Section 17 (d) of the franchise ordinance provided:

"All land acquired by Kansas City in accordance with this section shall be forever maintained, improved and adorned without any expense whatever, directly or indirectly, to the Kansas City Terminal Railway Company except as provided in Section 37 hereof."

And Section 37 of the franchise said:

"The Kansas City Terminal Railway Company hereby agrees that all its right of way and other property now or hereafter owned may be charged with all taxes and local or special assessments for public improvements that might be lawfully assessed or made a charge against its property if it were not used for railroad purposes, and that it will promptly pay and discharge the same."

The city suggests that by these two sections the Terminal Company expressly agreed it should be chargeable with special assessments issued against the Union Station Park and that the parties meant thereby to provide that it should pay the tax bills in controversy now. But we do not think the two paragraphs should be so construed at all. Section 17 (d) merely said that Kansas City

should maintain, improve and adorn the park without expense to the Terminal Company except as provided in Section 37, and Section 37 stipulated that the right of way and other real estate of the Terminal Company then and thereafter owned should be chargeable with such local and special assessments for public improvements as might lawfully be charged against the property if not used for railroad purposes. This subjected the Terminal Company's real estate to special assessment for public improvements lawfully made by Kansas City in maintaining, improving and adorning the park, but it did not make the Terminal Company liable for a special assessment *against the park.* The land of the Terminal Company which is referred to in Section 37 evidently is the land owned and used by it, because the section says the land shall be subject to special assessment the same as *if it were not used for railroad purposes.* We think there is no merit in respondent's contention.

There are one or two other suggestions made by the city, but we think it is unnecessary to discuss them.

Our conclusion is that the special tax bills which the city was forced to pay were not incumbrances against the park which the Terminal Company was required by its franchise to discharge, and for that reason the judgment in favor of the city and against the Terminal Company was erroneous. The judgment is accordingly reversed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.